**TRIANGLE CONDUIT & CABLE CO., Inc., v. NATIONAL ELECTRIC PRODUCTS CORPORATION.**

No. 8764.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 13, 1945.

Decided April 12, 1945.

John Hoxie, of New York City (Marvel & Morford, of Wilmington, Del., and Hoxie & Faithfull and George E. Faithfull, all of New York City, on the brief), for appellant.

Samuel E. Darby, Jr., of New York City (Southerland, Berl & Potter, of Wilmington, Del., and Floyd H. Crews, of New York City, on the brief), for appellee.

Before PARKER and GOODRICH, Circuit Judges, and BARD, District Judge.

BARD, District Judge.

This is an appeal from a judgment of the District Court invalidating Robinson and Moore patents Nos. 2,222,555 and 2,222,556 and Frederickson patent No. 1,828,772, and dismissing a counter-claim for infringement.

Plaintiff brought suit seeking a declaratory judgment to invalidate the Robinson and Moore and other patents and defendant brought a counter-claim seeking damages for infringement. The District Court

concluded that six of the patents were invalid and defendant now appeals to this court from that portion of the judgment invalidating Robinson and Moore patents Nos. 2,222,555 and 2,222,556 and Frederickson patent No. 1,828,772.

■ The sole issue presented is patentability since it is evident that the patents, if valid, are infringed. The patents are owned by National Electric Products Corporation, hereafter referred to as "National", and the alleged infringer is Triangle Conduit and Cable Company, Inc., hereafter referred to as "Triangle". The Robinson and Moore patents, pertaining to fibrous covered rubber insulated electrical building wire, will be considered together since the second patent describes the same combination but in a specific improved form. Theroz Co. v. United States Industrial Chemical Co., D.C., 14 F.2d 629.

Electrical wire used in the interior wiring of buildings is covered by a rubber compound to insulate the electrical current and maintain its flow within the wire circuit. It is essential that the rubber insulation be preserved intact and protected from the injurious effect of light, air and moisture. To provide this protection the rubber insulation is enclosed in a cotton jacket which is impregnated with an asphaltic compound, then coated with a pitch material, and finally waxed on the exterior. The cotton jacket protects the rubber from knocks, blows and kinks which are encountered during installation of the wire and, in addition, provides a base for the protective coatings of pitch and wax.

For many years the standard cotton jacket was a braided fabric. It provided ideal protection for the wire under the most severe kinking and stresses but it was not economical. Its application was slow since the threads were interlaced around the wire by a braiding machine consisting of two circles of spools mounted on carriers turning in opposite directions about the wire which was drawn up through the machine. The overlapping of threads was wasteful of cotton and the final product was of uneven thickness.

The electric wire industry had developed another form of jacket known as a "serving" consisting of cotton threads spirally wrapped on the wire in one direction only, with parallel turns laid close together without overlap at a substantial angle. The serving overcame all the economic disad-

vantages of the braided jacket. It could be applied quickly in an even layer without waste of material. But it had a tendency to separate and expose the rubber covering when the wire was subjected to a sharp bend, and this basic defect precluded adoption of the serving as a standard approved covering for wire.

For over twenty-five years the art addressed itself to the problem of eliminating the separating tendency of the serving. McCulloch patent No. 1,216,337 of 1917 proposed a serving interlaced with threads running lengthwise or helically. It failed to solve the problem in that it was basically a braiding operation and had similar economic disadvantages. In 1926 Western Electric Company developed Lamplough patent No. 1,610,954 which prescribed application of the serving before the rubber covering was vulcanized, the whole to be drawn through a hot bath or saturating compound so that the threads of the serving would become firmly attached to the softened rubber. The process failed to keep the serving in place when the wire was kinked and Western Electric returned to the use of an improved braided jacket. Frederickson patent No. 1,900,492 issued to National in 1933 paralleled the Western Electric scheme of adhesion and proposed a saturant of stearin pitch to induce firm attachment of the serving to the rubber. The adhesion was insufficient to prevent separation of the serving and the patent was rejected by the Underwriters' Laboratories.

The Robinson and Moore patents of 1937 successfully solved the problem which had confronted the art by combining a new counter-wound locking thread with the traditional spiral serving. The first claim of the patent contains the following description:

"1. An insulated conductor structure having a flexible metallic conductive element, and inner insulating structure and an outer protective jacket in the form of a filamentary insulating serving surrounding the said metallic conductive element with the turns of said serving lying against each other in a simple helical lay to form a closed wrapping, and a locking filament laid in a helix opposite in sense to the helix of the closed wrapping and disposed in the assembly outside and in contact with the said wrapping, said locking filament being laid with its turns out of contact with each other in an open binder structure and arranged each to form an angle approximate-

ly as great as 60° with the longitudinal axis of the conductor."

The spiral serving and counter-wound locking thread could be applied rapidly and cheaply and easily satisfied the economic goal sought by the art. Although inferior in many respects to the braided jacket, it provided an adequate protective covering for rubber insulated building wire and was approved by the National Board of Fire Underwriters. Competing manufacturers, with the notable exceptions of Western Electric Company and Triangle, entered into licensing agreements with National. The licensed manufacturers and Triangle, which was not a licensed company, began production of the Robinson and Moore wire and the product achieved immediate commercial success.

 The basic contention asserted by Triangle is that the Robinson and Moore patents are anticipated by Roberts patent No. 242,911 (British). One of the prerequisites of a patentable invention is that it must be new or novel. The Roberts patent effectively negatives any novelty in the Robinson and Moore patents and is clearly an anticipation thereof.

The Robinson and Moore patents describe a serving consisting of threads wound helically around a rubber covered wire to form a closed but non-overlapping covering which is secured by a widely spaced binder thread oppositely wound at about a 60 degree angle to the longitudinal axis of the conductor. The threads which form the wrapping or serving are described as "fiber threads of moisture resistant character such as cotton, lint, hemp or *paper* thread". (Italics supplied). The use of a serving has been advocated by the art for some twenty-five years; but the patentable feature claimed is the use of oppositely wound locking cord which prevents separation of the serving when the conductor is bent or kinked.

The Roberts patent describes an improved, paper insulated, electric cable. The cable is covered by insulating strips or tapes of paper wrapped around the cable at an angle "approaching parallelism" with the longitudinal axis of the conductor. A widely spaced binding of paper, cotton tape or thread is oppositely wound around this layer at an angle which is not described but which appears, in the diagram, to be a slightly larger angle with the longitudinal axis than the 60 degree angle of the binder thread in the Robinson and Moore patent. Another layer of paper, wound in the opposite direction, together with another binder thread, provides double insulation; the whole is then enclosed in a leaden sheath.

 The paper covering layer in the British patent is a spirally wrapped insulator which is similar to the Robinson and Moore serving except that it lays at a slightly different angle and has a greater thickness. Both patents permit the use of paper as a wrapping material, but the American patent also permits the use of cotton, lint and hemp. Although the Roberts patent does not describe the wrapper as a "serving", it must be the prior device itself and not merely the words by which it is described or the scope of the claim which provides the measuring rod of anticipation. Minerals Separation North American Corporation v. Magma Copper Co., 280 U.S. 400, 50 S.Ct. 185, 74 L.Ed. 511; Lanyon v. M. H. Detrick Co., 9 Cir., 85 F.2d 875.

National contends that the Robinson and Moore patents present an entirely different co-action of elements from that indicated in the Roberts patent. Specifically, the contention is made that the binder thread in the British patent combats the internal expanding force of a thick paper wrapper, whereas the binder thread of the American patent is intended to combat the separating force on the serving caused by a sharp bend or kink in the conductor.

 We cannot agree with this contention. It is true that Roberts did not assert that his binder thread would prevent separation of the spiral paper wrapper if the cable was sharply bent. But that problem was not before him. He was experimenting with a heavy, lead sheathed cable which was not subjected to bends or kinks. It is a fair inference that if the heavy cable had been kinked, the binder thread described by Roberts would have prevented separation of the paper wrapper just as the Robinson and Moore binder prevents separation of the serving. The identical co-action must have been present. Either Roberts did not realize this fact or he did not perceive any value in describing this co-action of forces when it had so little direct relation to a heavy cable. It is of no significance that Roberts made no mention of the particular forces which his binder thread would combat or even that he did not appreciate that the binder thread would prevent separation of the spiral wrapper

when subjected to a bending force. Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669. Nor can the scope of his patent be diminished by his failure to describe sufficiently the scientific principles under which it operates. Smith, Executor, v. Hall, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049. The inventor is entitled to whatever merits his invention has, even though they may be greater than he supposed.

■■■ Although it is true that the Robinson and Moore patents solved a long standing problem of the art, the only flash of genius to which they can be ascribed is the realization that an existing patent could be applied to a new and perplexing problem. But the observation of a new use in a prior patented device is not patentable; and the mere fact that the inventor did not use his device for that purpose or did not foresee that the purpose might be useful is immaterial. Mathews Conveyor Co. v. Palmer-Bee Co., 6 Cir., 135 F.2d 73. The discovery that the Roberts binder thread possesses an unexpected advantage and accomplishes an unexpected result did not entitle Robinson and Moore, who pointed out that fact, to a patent. Red River Refining Co. v. Sun Oil Co., D.C.E.D.Pa., 29 F.Supp. 636, affirmed in 3 Cir., 112 F.2d 575 on the opinion of, the District Court; Grand Rapids Refrigerator Co. v. Stevens et al., 6 Cir., 27 F.2d 243. The application of an old patent to a new use is not patentable. Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997.

■■■ Commercial success of the Robinson and Moore patents cannot be doubted and that factor would ordinarily be persuasive evidence of patentability. Electric Machinery Mfg. Co. v. General Electric Co., 2 Cir., 88 F.2d 11, certiorari denied 301 U.S. 702, 57 S.Ct. 932, 81 L.Ed. 1357. But in the present case, the success of the new patent was, in no sense, a recognition of an improvement in the art. The Robinson and Moore patent was the cheapest rubber covered building wire approved by the National Board of Fire Underwriters. Competing manufacturers, dealers and contractors had to adopt this cheap wire lest they find themselves unable to meet competition; and this was true regardless of the admitted fact that the Robinson and Moore wire was inferior in every respect save cost to the braid covered wire which had heretofore been used. Generally, the only specification of quality required of an electrical installation is that it satisfy the Underwriter Standard and, to make the lowest bid, the electrical contractor must buy the cheapest wire approved by the Underwriters. Therefore, commercial success was a direct result of Underwriter approval, but the approval by the Underwriters indicated only that the wire met a standard of safety and not that it was novel or patentable. Whatever may be the significance of Underwriter approval it is sufficient to point out that commercial success is decisive only where the question of invention is in doubt (Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382); but not where it is clear that invention is lacking (Pfanstiehl Chemical Co. v. American Platinum Works, 3 Cir., 135 F.2d 171) or there is anticipation. Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed 1731.

■■■ Frederickson patent No. 1,828,-772 describes a crumpled paper armor for individual conductors or non-metallic sheathed cable. The novelty upon which the patent relies is the use of soft compressible paper strands, wrapped spirally around an insulated conductor so that their edges overlap. McCracken patent No. 459,-378 shows the use of twisted ribbons of paper spirally wound upon an electric conductor surrounded by an insulating compound. If not completely anticipated by the McCracken patent, the Frederickson patent shows no patentable advance over prior art merely by substituting crumpled paper for soft compressible paper strands. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438.

For the reasons stated, the judgment below will be affirmed.

PARKER, Circuit Judge (dissenting in part).

I concur in the view that the Frederickson patent is invalid; but I think that the Robinson & Moore patents should be sustained. They filled a long existing want in the industry; they solved a problem to which skilled workers in the industry had long addressed themselves in vain; they provided a product which secured the approval of the underwriters' laboratories, which could be manufactured more cheaply than the products theretofore approved and which for that reason entered into general

use and achieved marked commercial success; and they embodied a combination of elements which I do not think had been anticipated in the art.

The nature of the braided jacket and the spirally wrapped serving, used by the industry as a covering for rubber-covered building wire, with the disadvantages to which both were subject, are set forth in the opinion of the court. There were many efforts to find a solution which would eliminate the disadvantages of the braid on the one hand and the serving on the other. McCulloch patent 1,216,337 of 1917, applied for in 1912, was a direct attack on the problem. It proposed interlacing the turns of the serving with either lengthwise or helical threads; but this failed to solve the problem. It did not offer the speed of application of a plain serving because it retained to some extent the crossing of threads as in braiding, and had other disadvantages inherent in that process. The Western Electric Company, in 1926, secured Lamplough patent No. 1,610,954, the scheme of which was to place a serving around the rubber covered wire and then pass the wire through a hot bath, the heat of the solution softening the rubber so that the threads would adhere to it. This attempt likewise was unsuccessful, and Western Electric switched its efforts to improving the braiding machine, developing one twice as fast as those previously used. An approach similar to that of Western Electric was made by National itself when in 1933 it secured the Frederickson patent 1,900,-492, which proposed a pitch coating to aid the adhesion of the serving to the rubber; but the result was a failure which did not secure the approval of the underwriters' laboratories.

The Robinson & Moore patents successfully solved the problem with which the industry had been struggling for more than two decades, i.e. they provided a covering for insulated wire which could be applied as rapidly as the spirally wound servings and which would meet the requisite safety standards. The solution was found in the use with the wrapping of servings of the reversely wound locking or binding thread, which holds the servings in place on the wire-when it is bent or twisted and prevents the opening of the servings and the resulting fracture of the protective covering. The National Board of Fire Underwriters approved the covering as sufficiently safe for inside wiring, and it entered immediately into extensive use and achieved marked commercial success. Though inferior in some respects to the braided jacket, it met the standard of safety of the Fire Underwriters and could be produced much more quickly and at less cost. The evidence shows that the use of the process of the patent has resulted in a four-fold increase in production per machine, with attendant economy in space, power and labor, as compared with the braiders formerly used. There is a further economy in cost of materials, as the process of the patents uses less cotton while giving a better coverage.

From what has been said it is clear that, while the elements of the combination for which the patents were granted were old, the combination itself was new and useful and resulted in a decided advance in the art. Under such circumstances I think there can be no doubt as to its being patentable; but, if there were doubt, the doubt should unquestionably be resolved in favor of the validity of the patents. To the ordinary presumption of novelty arising from the grant of the patents must be added the fact that the invention filled a long felt want in the industry and entered into immediate use. Temco Co. v. Apco, 275 U. S. 319, 324, 48 S.Ct. 170, 72 L.Ed. 298; Diamond Rubber Co. v. Consolidated Tire Co. 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. And in addition to this, there is the presumption arising from the imitation of the patented article by Triangle. As to this, I agree with what was said by Judge Hough, speaking for the Circuit Court of Appeals of the Second Circuit in Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277, 281: "The imitation of a thing patented by a defendant, who denies invention, has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think." See also Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir. 80 F.2d 912, 919.

I do not think that British patent No. 242,911 to Roberts, granted in 1925, is an anticipation. That patent dealt with an entirely different problem and in an entirely different way. It related to paper insulation for electric cables; and the gist of the invention was to insulate the cable by applying layers of paper over it with wrappers or bindings of paper or thread between the layers for the stated purpose

of separating them. Here the problem is to hold the servings of thread in place when the wire is bent or kinked and the thread used as a binder operates in an entirely different way and for an entirely different purpose from the wrappers or bindings of Roberts. The elements of the patents are different and their coaction is different. So different, in fact, is the one from the other that during the twenty-five years that various persons, including the Western Electric Company, were looking for a solution of the problem it never occurred to anyone to think that Roberts furnished the solution.

And I do not think, as argued by counsel, that what the patentees did was so simple as not to involve invention. As said by the Supreme Court in Diamond Rubber Co. v. Consolidated Tire Co., supra, "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skilful attention. But the law has other tests of invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of a change as a further evidence, even as demonstration." See 220 U.S. 428 at page 435, 31 S.Ct. 444, at page 447, 55 L.Ed. 527. The reason for this rule was well put by Mr. Justice (now Chief Justice) Stone in Paramount Publix Corporation v. American Tri-Ergon Corporation 294 U.S. 464, 474, 55 S.Ct. 449, 454, 79 L.Ed. 997, where he said: "Where the method or device satisfies an old and recognized want, invention is to be inferred, rather than the exercise of mechanical skill. For mere skill of the art would normally have been called into action by the generally known want."

Nothing is more likely to lead courts into error, I think, than the subjective approach to the question of patentability in an attempt to say in the light of "knowledge after the event" whether a flash ·of· genius was or was not present in what was done. While, of course, the courts are not to abdicate their common sense and the wisdom gained from experience, the approach to the question most likely to be correct is the objective one. The state of the prior art, the problem to which the invention was addressed, its success in solving the problem, its acceptance by the art and its success commercially,—these should be accorded more weight than what a court, unfamiliar with the art or with the problems of industry generally, may chance to think, in the light of the problem's solution, as to what one skilled in the art should have known or should have been able to do. When an inventor has really done something, when he has really solved a problem that has baffled an industry, when he has added to the sum total of human knowledge or produced something new of real service to an art, he is entitled to the protection of the patent laws and deserves better than to be told in the language of "knowledge after the event" that he has done nothing that anyone with the ordinary skill of the calling might not have done.

This is merely to say what was said better by Mr. Justice Day in Expanded Metal Co. v. Bradford 214 U.S. 366, 381, 29 S.Ct. 652, 655, 53 L.Ed. 1034: "It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement that he who first makes the discovery has done more than the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor."

Judge Learned Hand expressed the same thought recently in the case of Bresnick v. United States Vitamin Corporation, 2 Cir., 139 F.2d 239, 241, where he said:

"We have repeatedly said that in judging whether a new combination is an invention, we regard the history of the art as of much greater importance than our own untutored judgment as to what advances demand imaginative originality in specialized fields. Nothing can be less reliable than our naive impressions based upon gross appearances; the books never tire of warnings against

them. We have not that acquaintance with the subject-matter which alone could give them any value; we should resort to them only when all other means have failed. In the case at bar the history of the art very clearly indicates that the problem of preserving and masking vitamins derived from fish livers was no different from that of doing the same to those derived from vegetables, or from mammalian livers. Certainly nothing suggests any difference. Yet even so, had the art waited long for the step (especially if there had been intermediate unsuccessful efforts) and if the step, when made, had been an answer for which the art had been looking, we might have yielded."

The change wrought by Robinson & Moore over Roberts was certainly as great, if not greater, than the change involved in the paper making machine held patentable in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

And I do not think that this is a case in which commercial success can be ignored. It is true that commercial success resulted from the approval of the underwriters' laboratories of a product which could be manufactured at less cost and therefore sold at a lower price than the product currently used; but the approval of the underwriters was obtained only as a result of the invention of the patent. The utility of the invention was that it provided a satisfactory product at a lower cost. It is manifest that utility within the meaning of the patent law need not reside in improvement of function. A new product which will do the work of the old and which can be produced at less labor or expense is a useful one within the meaning of the patent laws; and its commercial success cannot be ignored merely because attributable to cheapness rather than improved functioning. While commercial success alone is not sufficient to sustain the validity of a patent (Sylvania Industrial Corporation v. Visking Co. 4 Cir. 132 F.2d 947; Durand v. Bethlehem Steel Co. 3 Cir. 122 F.2d 321), it is a factor to be considered as persuasive of invention when the validity of the patent is doubtful. Textile Mach. Works v. Louis Hirsch Textile Machines 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382; Artcraft Silk Hosiery Mills v. Gotham Silk Hosiery Co., 3 Cir., 72 F.2d 47.