**BRUEN et al. v. HUFF et al.**
**Civ. No. 7169.**

United States District Court
W. D. Pennsylvania.
Sept. 24, 1950.

Joseph Frease, Canton, Ohio, Albert G. McCaleb, Chicago, Ill., and Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., for plaintiffs.

Francis J. Klempay, Youngstown, Ohio, Wm. J. Ruano, Pittsburgh, Pa., for defendants.

BIGGS, Circuit Judge.

This action is brought pursuant to R.S. Section 4919, 35 U.S.C.A. § 67, by the owners of United States Patent No. 2,340,862, the Bruen patent, against the defendants, Huff, Troy and the Roto-Card File Company, Inc., for alleged patent infringement. Diebold, Incorporated (Diebold), the exclusive licensee under the patent, has been impleaded as a party-plaintiff. The defendants set up counterclaims for a declaratory judgment to have the patent declared invalid and for damages against Diebold for unfair competition. They also seek reasonable counsel fees.

As to the Validity of the Patent in Suit.

The patent issued on February 8, 1944 on an application filed August 8, 1942. Its subject matter is a rotatable horizontal card file, advertised and sold by Diebold as the "Cardineer". The principal features of the disclosures are described in Claim No. 1

set out below.[1] The claims in issue are. Nos. 1, 2, 4, 5, 7, 15, 17, 18, and 19.[2]

 The disclosures claimed are lacking in novelty over the prior art. Claim 1 of the patent to Dunne. No. 1,143,259. of June 15, 1915, for an "Office Desk * * *", covers a "rotatable book rest having a plurality of inclined surfaces, each of said surfaces being arranged to support a book, a shield adjustable relative to said books, said shield being arranged to cover either of said books, and a spindle on each said book rest is rotatably mounted, the book rest being adapted to be rotated with relation to the shield * * *". The figures accompanying the patent and its specifications disclose a device very similar, card holders aside, to that of Bruen.

The patent to Rice, No. 1,244,373, of October 23, 1917 for a "Book Supporting Stand", also embodies the substantial principle of the patent in suit. The patent to Caverly, No. 1,032,111, of July 9, 1912 for "Means for Carrying Out Business Systems" discloses a device very much like that claimed in the patent *sub judice*. Claim 4 of Caverly is as follows: "In a card holder, a combination of a support, a revolving case mounted on said support and having a plurality of card compartments open at the top and each having inclined side-walls, and adjustable card rests or fillers in said compartments and wedged between said inclined walls." While none of the patents referred to discloses or claims a card-mounting structure like that shown in the figures accompanying the patent in suit, the claims in issue cover merely a "card-mounting structure" or "card-mounting structures". This, at best, is only generally descriptive and the claims are not strengthened by the quoted phrase.[3] The

---

1. Claim No. 1 is as follows: "A card file comprising a supporting base, a deck rotatably mounted on the base for rotation about a vertical axis, a set of card mounting structures carried by the deck and arranged along its margin and polygonally about its axis, each card mounting structure being adapted to mount upon the deck a block of cards with the block extending transversely to a radius from the axis and transversely tilted outwardly, the cards being engaged by

the card mounting structure to swing about their bottom edges, whereby they will open up bookswise for inspection of both sides of the cards."

2. It was stipulated at the trial that the counterclaim for a declaratory judgment, originally directed by its terms to all the claims of the patent, should be limited to the claims in issue as just stated.

3. I pass by the question as to whether or not the card-mounting structure claimed

article, "Through Centuries of Record-Keeping", contained in the Journal "Office Appliances" of June 21, 1921, Vol. 33, No. 6, at p. 102 and the illustration of the revolving book stand or record-keeper illustrated above the title, "Record Keeper of the Middle Ages" also prove that the fundamental idea of the patent in suit is one of considerable antiquity.

■ It must be conceded that there is no invention in applying an old device to a new use. Triangle Conduit & Cable Co. v. National Electric Prod. Corp., 3 Cir., 149 F. 2d 87. The combination of elements disclosed by the patent in suit is as old as the individual elements themselves and this is old indeed. The elements of the combination certainly are not novel. Undoubtedly the old combination has been improved and is highly useful but these favorable factors are the result of the exercise of mere mechanical ingenuity. For this reason the combination does not demonstrate the genius necessary to support a patent. Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Hansen v. Slick, 3 Cir., 230 F. 627, 632.

The claims in issue are invalid also because rotary catalogue-sheet holders of the kind embodied in defendants' Exhibit A, a physical exhibit, have been in public use and on sale since 1935. An examination of the exhibit will demonstrate how closely that device corresponds to the combination claimed in Bruen's patent. Whether or not the card-mounting structures of Exhibit A were intended to be set about the margin of the deck and polygonally about the axis of rotation of the deck, is immaterial. It is clear that it is possible to arrange these standard Buchan parts so as to function effectively in this manner. See also defendants' Exhibit B, the Buchan Catalogue of 1935.

In reaching the conclusion that the claims in issue cannot be sustained I am not unmindful of what the plaintiffs refer to as the "tall card problem". "Tall cards" are defined by them as "cards approaching or

equalling or exceeding eight inches in height". It is obvious, of course, that the larger and longer the card the more difficult becomes the task of examining it in a file, whether the card be used for perpetual inventory or stock control systems or for any other purpose. Many of the problems presented by cards which contain many entries are discussed in the report of the "Sub-Committee on Parts Perpetual Inventory and Stock Control System for Branches", plaintiffs' Exhibit No. 4, prepared by the International Harvester Company but it is sufficient to state here that the development of means to handle the "tall card" or the large card consisted only of the application of known mechanical principles. Ingenuity, not invention, was exercised. It should be noted also that the patent in suit makes no reference whatsoever to the size of the cards to be used or to a "tall card" problem. This in itself is almost enough to dispose of the plaintiffs' argument.

■ Diebold's device, the "Cardineer", licensed under the patent in issue, attained a substantial degree of commercial success. But commercial success alone is not sufficient to sustain a patent though it may resolve a doubt in favor of patentability. Ainsworth v. Gill Glass & Fixture Co., 3 Cir., 106 F.2d 491, 495. In the instant case there is no doubt.

## As to Infringement of the Patent in Suit.

The claims in issue are invalid as has been stated. Nonetheless in view of the fact that this decision may be reviewed by the Court of Appeals, I deem it desirable to state my conclusion that the accused device, the "Roto-Card" file, is so similar to that covered by the patent that if the claims here in suit were valid, there would be no doubt but that they would be infringed by the defendants' "Roto-Card" file.

## As to the Claim of Unfair Competition Asserted by the Defendants Against Diebold.

The defendant, Troy, had been employed by Diebold as a salesman or a branch man-

in the claims of the patent in suit is sufficiently descriptive to meet the require-

ments of R.S. Section 4888, 35 U.S.C.A. § 33.

ager from about July 1940 until May 20, 1947, when he was discharged. The reason given by Diebold for discharging Troy was that he had absented himself from work without sufficient excuse. He had informed Diebold that he was in ill health and required medical attention but Diebold did not credit this excuse.[4] There was and is ill feeling between them. Diebold now asserts that Troy, and hence Huff, as well as Roto-Card File Company, Inc., do not come into court with "clean hands" and therefore cannot maintain their claim of unfair competition. The substance of Diebold's contention is that Troy and Huff in aid of their venture to sell "Roto-Card" files (horizontal rotatable card files which were almost Chinese copies of Diebold's horizontal[5] "Cardineer"), conspired to make unfair use of the International Harvester Company's report which discussed the usefulness and efficiency of various files including Diebold's. The plaintiffs contend in substance that by substitution of pages and titles in the report, Troy tried to palm off the "Roto-Card" file as equivalent or superior to Diebold's "Cardineer" when in fact the report discussed the "Cardineer" and not Troy's "Roto-Card" file; that Huff, with the aid of Doran, an officer of Harvester Company, procured a model of the "Cardineer" which was copied by Huff in order to make "Roto-Card" files; and that Troy and Huff by these and other unfair tactics tried to pirate Diebold's customers for the "Cardineer". In the view which I take of the case, however, it is unnecessary to decide the legal effect of Troy's and Huff's actions in these respects for it is clear from the record that the charge of unfair competition against Diebold cannot be sustained.

The defendants' main contentions in support of their claim of unfair competition may be divided into four parts. They insist (1) that Diebold's malice and bad faith toward them is demonstrated by the fact that suit was not brought on the Bruen patent, which issued on February 8, 1944, until the instant suit was filed on May 10, 1948. One other company, Herring-Hall-Marvin Company, was perhaps manufacturing equipment similar[6] to Diebold's "Cardineer". But Herring-Hall-Marvin Company was not soliciting Diebold's customers insofar as the record shows. Solicitation of Diebold's customer, International Harvester Company, by Huff commenced in January 1947 when a model of of the "Roto-Card" file was submitted by him to Doran at Harvester. Troy was still in the employment of Diebold at this time and it would be naive indeed, under the circumstances of this case, to believe that Troy was not aware of Huff's activities and, if he did not aid them, he, at least, condoned them. Diebold had difficulty in learning the source of this competition. The first formal proposal to build "Roto-Card" files for Harvester was submitted by Huff to Doran on March 4, 1947.[7] Production of "Roto-Card" files was commenced in the early part of May 1947 but Doran of Harvester continued to refuse to give Jackson, vice-president of Diebold, the name of the manufacturer of "Roto-Card" files as late as July 18, 1947.[8]

 Negotiations for a license under the Bruen patent were commenced by Troy and

---

4. See the letter of May 16, 1947 addressed to Troy in Nova Scotia, Canada, by Snavely of Diebold, terminating Troy's employment and stating, "It seems as though your physical examination in Boston was just a myth."

5. Diebold also made and sold vertical "Cardineers". They were not covered by the patent in suit and the defendants did not make or attempt to sell any file similar to them. Hereafter in this opinion when reference is made to *Cardineers* the reference will be to horizontal "Cardineers".

6. It is far from clear whether Diebold's witness, Erikson, when he referred to Herring-Hall-Marvin Company's "vertical wheel file", was referring to a file to be propelled about a vertical axis or an horizontal axis. See pp. 117–118 of the record.

7. Troy's collaboration with Huff commenced very early in January 1947, if not before, and, as has been said, during the first four and a half months of 1947, January 1 to May 20, Troy was still an employee of Diebold.

8. See Plaintiffs' Exhibit No. 26.

Huff sometime in August 1947. These negotiations continued until December 26, 1947, when Diebold's patent counsel informed Troy by letter that he could not expect to receive a license under the Bruen patent. Though Diebold repeatedly attempted to see a "Roto-Card" file that desire was not gratified until the latter part of January 1948. Diebold made repeated attempts to procure a "Roto-Card" file but it was not until March 26, 1948 (and then due only to the intervention of defendants' patent counsel) that Diebold finally procured a "Roto-Card" file, in fact, from the corporate defendant.[9] The suit at bar was filed within two months of the date last mentioned. Under these circumstances I do not find that there was any malicious, or even unreasonable delay in testing the validity of the patent in suit.

The defendants assert (2) that Diebold maliciously threatened their customers and deprived them of orders for the purpose of wrecking their business and that Diebold consummated its purpose. They contend also (3) that the Bruen patent, designated claims of which have been adjudicated here, is so palpably invalid that allegations of infringement and threats of litigation against those who bought "Roto-Card" files could not have been made in good faith. Diebold for its part insists that it did not threaten Huff's and Troy's customers, that the letter of July 11, 1947[10] written by Jackson to Harvester was not a threatening letter, and, in any event, that the communications between Diebold and the defendants' customers were proper under the circumstances and necessary if Diebold was to protect its rights under the Bruen patent.

It is appropriate to treat these various contentions as allied. I cannot agree with Diebold that the letter of July 11, 1947 was not a threatening letter in the sense that it did not threaten litigation if Harvester purchased "Roto-Card" files instead of Diebold's 72–70 "Cardineer", covered by the Bruen patent. The letter plainly implied that suit might be brought by Diebold against Harvester. To say to a person that he may be sued is to threaten him with suit. The response of Pippel, Harvester's patent attorney, to the letter was entirely normal in this connection. Because of Jackson's letter the defendants undoubtedly lost business which they would have had with Harvester. For example, orders 1 and 3 for "Roto-Card" files were cancelled by Harvester. Orders 2 and 4 apparently were not cancelled but they were never filled. But it must be borne in mind that Diebold had the right, in the exercise of the free competition of the business world, to protect its own business and to try to retain or secure customers for the "Cardineer".

Diebold, of course, had no vested interest in its customers and Troy was at liberty to acquire them if he could for Roto-Card File Company. The rules of the game permit much freedom of action by the participants in a free competitive market. But it must be borne in mind that Troy, while he was in the employ of Diebold had acquired valuable contacts for the sale of both "Cardineers" and "Roto-Card" files, and that he was bent upon pursuing them. He had the right to do this but his path led, hardly coincidentally, from one to another of Diebold's customers,[11] customers.

---

9. As has been said, Troy and Huff caused the incorporation of the defendant company. Troy was its sales agent and Huff was in charge of manufacturing. The company was in fact Troy and Huff and though I shall not disregard the corporate fiction in this opinion I have treated and shall continue to treat the corporation as one with Huff and Troy. Huff Porcelain Steel Marker Company and Sharon Machine Products Company also should be so treated.

10. Defendants' Exhibit "Z".

11. Harvester had been Diebold's customer for various types of office equipment for a long period.

Chrysler Corporation had been a Diebold customer for about twenty-four years. Mopar Company, a wholly owned subsidiary of Chrysler, dealing in motor parts, apparently was not a customer of Diebold though Troy while in Diebold's employ had attempted to sell "Cardineers" to it. I find that Diebold did not threaten Chrysler with an infringement suit. The record is not clear in this regard as to Mopar. I therefore find that:

with whom Troy had dealt while he was employed by Diebold. Diebold, in general,[12] followed Troy down this well-trod path, energetically informing its customers that "Roto-Card" files infringed the Bruen patent and implying that the customers might find themselves defendants in infringement suits. Diebold and Troy and Huff were vigorously fighting each other.

■■ Nor can I take the position that the Bruen patent is so palpably invalid that the plaintiffs' allegations of infringement could not have been made in good faith. Every patent issued in the United States is supported by a presumption of validity. Radio Corporation v. Radio Engineering Laboratories, 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163. Any person alleging invalidity has the burden of establishing it. Morgan v. Daniels, 153 U.S. 120, 123, 14 S.Ct. 772, 38 L.Ed. 657. While the defendants have met this burden in the instant case and the court has held that the claims in issue of the Bruen patent are invalid, nonetheless Diebold was entitled to rely on the presumption of validity. To hold that a duly issued patent may be invalid on its face and that anyone who sues on it must be deemed to be acting maliciously and in bad faith would bring a novel doctrine to the patent law and one that I decidedly am not prepared to initiate.

■■ The defendants point out (4) that at least some of the "Cardineers" bore no patent marking, and if I correctly apprehend their contention in this regard, they urge that this omission constitutes further evidence of bad faith and malice on Diebold's part. Since the "Cardineers" were manufactured under the Bruen patent by Diebold, the exclusive licensee thereunder, the "Cardineers" should, of course, have been properly marked. No adequate explanation for the omission is given in the record but I am inclined not to attach much weight to it. Failure to mark probably was due to inadvertence and I do not find that the omission of the patent marking constituted bad faith or malice on Diebold's part. As to the effect of not employing a patent marking see New York Pharmical Association v. Tilden, C.C., 1882, 14 F. 740.

■ I find it to be a fact that Diebold's course of conduct seriously damaged the defendants' business and caused it to become insolvent. That business was a small one and easily put to rout. The defendants' legal position is none the worse because of this but Diebold was within its rights in giving notice of possible infringement to the defendants' customers. The evidence will not support the charge that Diebold intended to destroy the defendants' "Roto-Card" file business. The injury suffered by the defendants was incidental to the protection of Diebold's own market. Diebold's communications to the trade contained no false, offensive or approbrious

---

Diebold did not threaten it with suit.

Kaiser-Fraser Company had been a customer of Diebold since its Willow Run plant opened and Troy had solicited its business for the "Flying Jenny", an early form of the horizontal "Cardineer". I find that Diebold did not threaten Kaiser-Frazer. Kaiser-Frazer actually insisted that it would have to have a guarantee from Diebold to hold it harmless from suit if it purchased horizontal "Cardineers".

Lake City Motor Sales Company (sometimes referred to as Lake Sales Company) had become a customer of Diebold on August 16, 1947. The company had ordered four "Roto-Card" files from the defendants on November 13, 1947. In January 1948 Yeagle, of Diebold's Cleveland office called on Lake City and Yeagle told McIllheney that the "Roto-Card" file was infringing the Bruen patent and

that Diebold was going to look into the matter and follow it up. Yeagle's statement was a mild one but in my opinion it amounted to a threat of suit.

Robert Smith Motor Sales Company was visited by Diebold's salesman, Lane, in about January of 1948. Lane saw several "Roto-Card" files in the Company's office. The "Roto-Card" files were exhibited to Lane as representing a new and revolutionary idea and Lane replied in substance that this was not so; that three Diebold "units", #72-70 horizontal "Cardineers" had been used within two blocks of Smith Company's office for a number of years by the C. & D. Company. I find that Lane did not threaten Smith Company with an infringement suit.

12. Robert Smith Motor Sales Company constitutes an exception to the general course referred to.

language. In fact what Diebold said was comparatively mild.

■ In the light of all the circumstances I conclude that the defendants have not sustained the burden of proof required by the counterclaim. See Everybody's Tool & Die Works, Inc., v. Costa, D.C.E.D.N.Y., 9 F.Supp. 440; Gibson v. Smoot Engineering Corporation, D.C.D. Del., 50 F.2d 203; Chaney Co. v. Cunningham, D.C.W.D.Pa., 37 F.Supp. 224; Celite Corporation v. Dicalite Co., 9 Cir., 96 F.2d 242; Alliance Securities Co. v. De Vilbiss Mfg. Co., 6 Cir., 41 F.2d 668, and United States Galvanizing & Plating Equipment Corp. v. Hanson-Van Winkle Munning Co., 4 Cir., 104 F.2d 856.

### As to the Defendants' Claim for Reasonable Attorney's Fees.

■ The defendants claim that they are entitled to an allowance of reasonable attorney's fees to be fixed by the court and taxed against the plaintiffs. The defendants rely, apparently, upon the provisions of R.S. Section 4921, as amended August 1, 1946, c. 726, 60 Stat. 778, 35 U.S.C.A. § 70. The pertinent amendment provides that: "The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case." The defendants have prevailed upon the patent side of this litigation but it clearly was not the intention of Congress that the recovery of attorney's fees should become the ordinary or usual thing in patent suits. See Senate Report No. 1503, June 14, 1946, U.S. Code Congressional Service 1946, p. 1387, and Union Nat. Bank of Youngstown v. Superior Steel Corporation, D.C.W.D.Pa., 9 F.R.D. 123. There is present in the instant case no circumstance which would justify the award of a fee by the court to the attorney for the defendants.

I believe that all necessary findings of fact and conclusions of law are contained in this opinion as contemplated by Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.

All costs in the instant case, save those accruing under the claim of unfair competition will be taxed against the plaintiffs. The costs accruing under the claim of unfair competition will be taxed against the defendants.

A decree may be submitted.