Alfred E. HAMILTON, Plaintiff,

v.

MID-WEST ABRASIVE COMPANY, Defendant.

Civ. A. No. 62-275.

United States District Court
W. D. Pennsylvania.

April 16, 1963.

Thomas H. Murray, John David Rhodes, Pittsburgh, Pa., for plaintiff.

Joseph R. Robinson, Jr., Pittsburgh, Pa., Clarence B. Zewadski, William H. Griffith, Detroit, Mich., for defendant.

WILLSON, District Judge.

This is an action by plaintiff, Alfred E. Hamilton, for money damages and injunctive relief against the defendant, Mid-West Abrasive Company, for infringement of plaintiff's United States Letters Patent No. 2,442,042, issued May 25, 1948. This Hamilton patent covers a grinding apparatus used in the stainless steel industry to grind away scales and surface defects on stainless steel slabs or billets at an intermediate point of production. Plaintiff contends that defendant's slab grinding machines and its billet grinding machine infringe on plaintiff's claim 7, and further that defendant's billet grinding machine infringes on his claim 10. The only difference between defendant's slab grinding and billet grinding machines is that the latter has a movable carrier or work table upon which billets are placed for grinding, while the former utilizes a stationary work table.

One of the problems in the production of high alloy steel which both plaintiff and defendant sought to solve by their respective grinding machines is concisely stated in an excerpt from an article printed in November of 1957 in the trade publication, Grinding and Finishing, Plaintiff's Exhibit R, entitled "Automatic Billet Grinding". It reads:

"Rolling 5% chrome steel and higher alloys up through various stainless grades presents a real problem. The problem arises not from the rolling so much as from the necessity of preparing the surface of a billet, bloom or slab before it is rolled. While the surface will be nothing like that obtained by machining, it must be clean and free of serious irregularities.

"BLOOMS ROLLED * * * ARE ABOUT THE SIZE OF LARGE RAILROAD CROSS TIES AND LARGER.

"That means a large surface area to clean up. That much surface is a problem when the material is too hard or too tough to clean up by older methods.

"Chipping has been a popular method of preparing the surface of steel ever since steel was first rolled. In the early days, chipping was a hand process performed with air or hand hammers and chisel-like tools. Later, machines similar to a contour milling machine with gang cutters were used for mechanical chipping.

"Even these could not do the job on harder alloys. Such material must be annealed before it can be

chipped. This is an expensive step added to others in the processing of various alloys.

"Scarfing is employed on carbon steels. An oxyacetylene torch burns off the surface of the metal and leaves a smooth, clean finish for further working. But scarfing is not applicable to all alloy steels.

"THE HIGHER ALLOYS DEMAND A DIFFERENT KIND OF TREATMENT: GRINDING.

"Originally, the grinding or 'snagging' of forged billets, blooms and slabs was done with powerful swing frame grinders suspended from overhead. The swing grinder balances a 24 in. x 3 in. wheel assembly on one end and a heavy electric motor on the other. The operator grasps handles near the wheel and applies his weight downward against the work.

"It is not easy! Yet, it gets a grinding job done when chipping or scarfing is out of the question. Even so, muscular force, however it may be coupled with electric power, is not the most efficient way of getting a job done.

"This, briefly, is what led to recent developments in mechanized snagging for steel mills. Although the mechanized grinder demands more skill from the operator and more maintenance than the swing grinder, it has many features in its favor. It is ideal for materials which cannot be scarfed or chipped. It cleans up flaws and defects in the metal more economically than does the swing grinder. It performs more actual work and does it faster. It eliminates excess physical exertion. It reduces the overall cost of production. It provides safety for the operator."

Defendant contends that plaintiff's cause has no merit in that: (1) the patent is invalid because (a) it is anticipated in the prior art; (b) it lacks invention over the prior art; (c) its advance over the prior art, if any, is simply one within the skill of the mechanic and does not denote invention; (d) claims 7 and 10, in suit are simply an aggregation of old and well known elements and steps performing the same functions as they did in the prior art; (2) claims 7 and 10 are not infringed; and (3) plaintiff has lost all rights to enforce his patent against this defendant because of his delay and laches in bringing this suit.

This case has been tried upon the issue of validity. The cases for injunctive relief and money damages have been held in abeyance pending the determination of the validity and laches issues. Upon full consideration of all the evidence and the oral arguments and briefs of counsel, this Court has concluded that the patent is invalid and that the plaintiff is guilty of laches in the bringing of this suit. Because of the conclusion, this opinion will not discuss the defense of non-infringement as the decision disposes of the entire controversy.

Plaintiff's invention describes an apparatus that is particularly suitable for grinding metal slabs or billets, although certain features are useful in grinding other articles. It is a machine designed to provide for grinding heavy pieces of metal under greater grinding pressures and with a more rapid removal of metal than is possible with various forms of grinding machines previously used. There are eleven claims in the patent but plaintiff relies in this suit on claims 7 and 10. These claims are as follows:

"Hamilton 2,442,042

Claim 7

(1) Grinding apparatus comprising a carrier for a work piece,

(2) a grinding wheel mounted on an axis that is approximately parallel to the plane of the carrier.

(3) means for imparting relative traveling movements to the carrier and the grinding wheel,

(A) in directions transversely of and approximately parallel to the axis of the grinding wheel,

(4) means for rotating the wheel,

(5) and means for oscillating the grinding wheel in a plane that is perpendicular to the plane of the carrier and on an axis that is parallel to the end faces of the grinding wheel and which is spaced a substantial distance from the grinding plane.

Hamilton 2,442,042

Claim 10

The method of grinding which comprises

(1) moving a work piece past a grinding wheel

(2) while rotating the wheel on an axis that is approximately parallel to the path of travel of the work piece,

(3) while oscillating the grinding wheel on an axis that is transverse to its axis of rotation and parallel to the face of the work piece and

(4) while bodily moving the grinding wheel on the work piece in directions transversely of said path,

(3) the said axes of oscillation being spaced a substantial distance above the plane of contact by the grinding wheel with the work piece when the wheel is positioned above the work piece."

The crux of both claims is the provision that the oscillation of the grinding wheel be on the axis of rotation, parallel to the face of the work piece and a substantial distance above the point of contact by the wheel with the work piece. This oscillation is needed in order to "dress" or "unload" the grinding wheel of the metallic cuttings and refuse from the wheel itself, that have a tendency to cling to the wheel in such a manner as to reduce the effective grinding ability. The wheel, by centrifugal force, will clean itself so long as it is not in contact with the surface to be ground. By Plaintiff's method of oscillation it is claimed that a sweeping motion is obtained and in this manner some contact is continued with the work piece so that there is a steady and constant grinding, hence a more effective grinding process. The Hamilton patent utilizes a swing table to support the work piece to move the piece on a longitudinal plane while the wheel traverses the piece. What actually happens is that a path is cut across the work piece by the wheel much like that by a car wheel moving in fresh snow, and then the carrier moves a step to the side of that path, and another path is either cut back across or across. This process is repeated step by step until the whole slab is ground free of the defects.

Prior to 1945 and still today in some areas, grinding was done by a swing frame grinder. This is a mechanism that is usually suspended from above, but is sometimes supported from below, consisting of a power driven grinding wheel on a counterbalanced boom, that can be addressed to the surface of the work piece and moved over and across it by manual effort. Usually there are wheelbarrow like handles that enable a workman to move and operate the machine. The defendant offered into evidence a number of patents showing prior art swing frame grinders. The only difference between the movements of Hamilton's patent and the swing frame grinder is Hamilton's work piece carrier moves step by step while the grinding wheel traverses the work piece in a perpendicular path to the movement of the carrier. The swing frame grinder utilizes a stationary work piece. But plaintiff has argued that this is nothing more than a simple reversal of parts. This being true as to the question of validity, then the swing frame grinders of the prior art anticipate claims 7 and 10 of the Hamilton patent. For purposes of this opinion, only three of defendant's cited patents will be referred to to show prior art.

The T. S. McGuire grinding machine was patented on November 23, 1920, under Patent No. 1,359,718. The grinding wheel is suspended on an extending boom

that has several swivel connections enabling the wheel to be turned in almost any direction. In addition the boom extension that actually holds the grinding wheel at a point of intersection with the axis of the wheel, extends from a larger boom in a telescopic fashion. This method of connection enables the grinding wheel to oscillate on the longitudinal axis of the boom and is therefore oscillating a substantial distance above the stationary work piece.

The F. W. Marschke, et al., patent No. 1,800,037, was issued on April 14, 1931, for a swing grinder. In this machine the grinding wheel is mounted on one end of a lever-frame, which carries at the other end the driving motor. The frame is supported at an intermediate point so that the weight of the motor and the weight of the wheel counterbalance one another. The lever-frame support includes a bearing to permit adjustment to various angular positions about the axis of the frame. This bearing is in addition to other swivel connections that tend to enable oscillation of the grinding wheel on the longitudinal axis of the boom. It is most interesting to note that there is a striking similarity to the means of supporting the lever-frame in the Marschke and Hamilton patents. But for size they look almost identical at that point. Being so much alike it is clear that both permit oscillation on the longitudinal axis of the boom at a pivotal point above the work contact point.

The E. W. Mikaelson et al. grinding machine was patented No. 1,462,420 on July 17, 1923. This patent, although with different details, is similar to the Marschke patent. The grinding wheel at the end of a swivel supported boom traverses the work piece by means of a wheeled support swing on tracks. A swivel allows oscillation on the longitudinal axis of the boom. Claim 5 of this patent states:

"Means for supporting the grinding wheel at one end of the frame (boom) whereby it may be oscillated about the longitudinal axis of the frame."

This is exactly the oscillation claimed by Hamilton.

Plaintiff has argued that the means for allowing the oscillation on the longitudinal axis of the boom in the swing frame grinder is simply to permit the manual operator to tilt the wheel and that tilting is all that was and is actually done. However this may be, it still remains that that type of oscillation is possible, and even though it may have depended upon the skill of the operator, the anticipation is there. It does not matter that the patents did not teach or point out the advantages of this oscillation, so long as the means for oscillation are disclosed in the patents.

"But the observation of a new use in a prior patented device is not patentable; and the mere fact that the inventor did not use his device for that purpose or did not foresee that the purpose might be useful is immaterial." Triangle Conduit & Cable Co. v. National Elec. Prod. Corp., 149 F.2d 87, 90 (C.C.A. 3, 1945), cert. den. 326 U.S. 744, 66 S.Ct. 59, 90 L.Ed. 444 (1945). The Mikaelson patent did foresee the usefulness as indicated in its claim 5.

An examination of the remaining patents on swing frame grinders disclose similar, if not the same, features as set forth in the above mentioned three. Those that date back to the early 1900's are much more simple, but still they employ the same basic ideas and principles. And this is so even though the use of the grinder was not necessarily in the stainless steel industry. For instance, the Taft patent, No. 411,839, issued October 1, 1889, was used in grinding and polishing road scraper blades, while the Damerow Patent, No. 772,222, issued October 11, 1904, was used in polishing implements.

With respect to the old swing frame grinders, plaintiff argues that the oscillation of the grinding wheel was not on the longitudinal axis of the boom. He

says that any such mechanism was only to permit the operator of the grinding to tilt the wheel, and to tilt it on an axis at the point of contact on the work surface. Yet, A. E. Hamilton, Jr., Vice President of the Hamilton Pump Company, plaintiff's son, recognized that this type of oscillating movement was possible in the old grinders, when he wrote for Iron and Steel Engineer in February, 1948, Plaintiff's Exhibit 2, at p. 3, the following:

"This movement, when combined with the transverse reciprocation of the head itself, and the intermittent travel of the conveyor, imparts a superhypocycloidal evolution pattern which never repeats itself. *This device expressly simulates the human shoulder and body movement of the man who laboriously operates the swing frame grinder.*" (Emphasis supplied)

Other witnesses, either at the trial or through depositions, introduced into evidence, testified to seeing swing frame grinder operators operate their machines in this manner. Even plaintiff, himself, acknowledges this possibility so long as the operator was a man "with the strength of Dempsey". The point is that there is no question but that it was and is possible to oscillate the swing frame grinders on the longitudinal axis of the boom at a point above the work piece even though it may not be the easiest and usual manner of operation.

■ With the admission by plaintiff that the crux of his invention resides in the oscillation of the grinding wheel on a pivot point a distance above the work, it is clear that claims 7 and 10 are anticipated by the prior art.

■ It should be noted at this point that of the three prior art patents discussed above, not one of them was considered or cited by the patent examiner when granting the Hamilton patent. Therefore, the presumption of validity of the Hamilton patent over the prior art patents is certainly weakened, if not overcome completely. Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367 (C.C.A.3, 1962). As in the Chemical Construction case, this decision rests on the interpretation of the claims in issue and a careful appraisal of relevant prior art.

■ As has been very briefly pointed out, oscillating a grinding wheel on an axis spaced some distance above the work was a common expedient before the Hamilton patent. All the elements of Hamilton's claims 7 and 10 are old elements. Thus this Court, in accordance with the views of the Supreme Court, has scrutinized these "combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements," in arriving at its decision. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The situation here is as that stated by the Third Circuit Court of Appeals in Chemical Construction Corp. v. Jones & Laughlin Steel Corp., supra, 311 F.2d p. 371.

"The alleged inventions of the apparatus claims comprise nothing more than an aggregation of old components in an apparatus in which these components perform no function or operation different from that theretofore performed by them in earlier gas washers. Such aggregations lack invention and are not patentable." (Cases cited)

See also Packwood v. Briggs & Stratton Corp., 195 F.2d 971, (C.C.A.3, 1952).

Chemical Construction, 311 F.2d at p. 373, also rules invalid any method claim (Claim 10) in the Hamilton patent.

"The methods of the claims in issue embrace nothing more than the operational steps employed in the prior art. * * *

"The methods conceived by the patentee, measured by commonly accepted criteria, do not surpass the common knowledge and skill of the art but arise from it as a consequence of its normal and expected development."

The fact remains that even though oscillation on the wheel's axis above the sur-

face of the work may not have been taught or done, nevertheless, the prior art patents allowed for just this possibility. Such oscillation was actually practiced, therefore, claims 7 and 10 of the Hamilton patent are invalid due to prior art.

## ON DELAY AND LACHES

Plaintiff, Alfred E. Hamilton, at the time of trial was 72 years of age and as his counsel says in the brief, is a graduate engineer with diverse experience in the metal and glass industry. In his early years he had been employed in the steel business and then became a consulting engineer. In 1925 he founded the Hamilton Pump Company. This company designed and produced pumps, machinery and custom ordered products until 1953 when a firm known as Hamilton and Sons was formed. His counsel says that it was during the flourishing years of Hamilton Pump Company that Hamilton was most active as an inventor. Plaintiff is the owner of 32 United States Patents and 10 Foreign Patents having to do with glass and metal processing. In their brief plaintiff's counsel summarized the background events which led Mr. Hamilton into the invention involved in this case. Counsel says:

"Certain of the engineering and production activities of Hamilton Pump Company were directly concerned with the finishing of stainless steel. Through the design and sale of strip grinding machinery plaintiff became known to Sharon Steel Company. In or about 1945 Sharon Steel requested plaintiff to design and build a better machine for grinding stainless steel slabs and thereafter entered into an agreement for financing a pilot model."

The only machine plaintiff has constructed was the one installed at Sharon Steel. Sharon Steel, under plaintiff's direction, operated this machine for approximately eight months. Plaintiff claims that the machine did the work for which it was designed but that it was uneconomical because it removed too much metal from the billet, and Sharon Steel lost interest in it. Plaintiff testified that he lost some $40,000.00 in the Sharon Steel venture. The testimony is that nothing further has been done by plaintiff with regard to his invention until his counsel Mr. Murray wrote defendant the letter of November 29, 1961, Defendant's Exhibit 9A. The suit in the instant case was not filed until April 7, 1962.

In the meantime during 1949 and 1950 defendant had one Muehling develop for it a slab grinding machine. It sold the first one in 1951 to the Rotary Electric Steel Company of Detroit. Defendant's next five machines also went to Rotary Steel. As early as April 28, 1952 machines were being sold in the Western District of Pennsylvania. From 1951 to the present defendant has sold 156 machines, a number of which were sold each year during this period of time. It is undisputed that defendant has expended approximately $145,000.00 in improving and refining the accused machinery. And further, in 1955 defendant desired to own the Company that was making the machine for it and expended $81,-000.00 to purchase the entire capital stock of the Ballenger Company. It is clear also in the record that everyone of defendant's machines, after the first six, have automatic means to oscillate the wheel. The first six machines did have a mechanism installed for tilting and oscillating the wheel by touching one button and then another, but the oscillation was not automatic. Thus the actuality of the situation is that defendant was actively in the production and sale of its machines from 1951 to the present.

Defendant has raised the defense of delay and laches. Its counsel cites Pearson v. Central Ill. Light Co., 210 F.2d 352, 356, (C.C.A.7, 1954), which in turn quotes from Johnston v. Standard Mining Co., 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480, (1893), where the Supreme Court says:

"* * * the law is well settled that where the question of laches is in issue that plaintiff is chargeable with such knowledge as he might

have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."

What were the facts known to Mr. Hamilton in the early 1950's? In the first place on November 6, 1947, an article in the Iron Age, a magazine circulating in the steel industry described the Hamilton machine, Plaintiff's Exhibit P, in considerable detail. One paragraph in the article describing the machine reads as follows:

"The purpose of this action is to simulate the motions of the human shoulder. Aside from elimination of the human factor, the mechanical oscillatory movement permits deep snagging and metal removal when required. It is also intended to keep abrasive grain constantly sharpened and thus prevent wheel loading."

In Iron Age Magazine, the September 27, 1951 issue, less than four years later, another article appeared describing defendant's accused machine. The article is entitled "Automatic Grinder Cuts Stainless Conditioning Costs". It dealt with the defendant's machines installed at the Rotary Electric Steel Company in Detroit. It stated that Rotary expected to replace all swing grinders with the new snagging grinder. It continued:

"Development of the grinder has been in progress several years. Details of the machine were first suggested by men in the conditioning department at Rotary. Mid-West Abrasive Co. engineers cooperated with Rotary in developing the machine, and Mid-West built the grinder.

"The grinding machine moves on tracks parallel with the slab. Forward, backward and vertical motion of the grinding wheel boom is controlled by handlevers. The grinding wheel can be tilted 45° in either direction. Foot controls guide the machine along the tracks."

The article on the Rotary Steel installation indicated that machines had been installed in January of 1951. Two days after the Iron Age article appeared, Archworth Martin, Esq., plaintiff's patent counsel, wrote to Hamilton Pump Company a letter in which the Iron Age article of September 27th was referred to. Mr. Martin referred to the description in Iron Age and said: (Plaintiff's Exhibit A-A).

"* * * the brief description of the machine indicates to me it may infringe claims 7, 10 and 11 of Alfred E. Hamilton's patent 2,442,-042, issued May 25, 1948."

The following February 22, 1952, Mr. Martin again wrote Hamilton Pump Company, "Atten: Mr. A. E. Hamilton, Jr.," Plaintiff's Exhibit B-B, regarding a search made the day before with respect to patents and applications of Mid-West Abrasive Company. There were no patent applications pending according to the writer but he closed his letter by stating that there may be an application pending on the Mid-West Company Grinder which does not appear in the assignment record. Subsequently another trade publication "Steel", on March 29, 1954, Defendant's Exhibit 3, described the Rotary Steel installation made by defendant. The article indicated that Rotary Steel had 14 of defendant's machines in operation. It is interesting to note that the article stated that besides this "new grinding bay", Rotary Steel still operates a battery of swing grinders. The article also indicated that the hydraulic motions under the wheel were "raising, lowering, tilting and reciprocating." Again in November of 1957 automatic billet grinding was described in an article appearing in Grinding and Finishing. This described installations of defendant's machines at Babcox and Wilcox, and Crucible Steel, both of which are in the Pittsburgh District.

Finally, on April 19, 1960, another article describing defendant's machines appeared in Grinding and Finishing and the results obtained in the plant of Uni-

versal Cyclops Steel Corporation during the preceding year. During the period of time from 1951 onward the articles in the trade magazines which had been mentioned had been read by plaintiff Hamilton, but he, at no time, made any personal investigation as to whether defendant's machine infringed upon his patent. It is significant to note that sometime in 1959 one of Mr. Hamilton's sons examined one of plaintiff's accused machines at Crucible Steel and plaintiff, of course, admitted that his son had revealed to him the description of the machine he had examined. However, during the ten year period from 1951 to 1961 plaintiff issued no warning or notice to defendant of his claim of infringement. He used as an excuse his poor health[1] and the fact that he had searched, through his counsel, for an infringing patent and had found none. But Mr. Hamilton must be charged with the knowledge and experience which he has as a successful engineer and patentee, that a person having the monopoly of a patent cannot sit idly by for ten years with the means of knowledge at hand and do nothing towards protecting his patent rights. As Judge Hartshorne says in Pierce v. International Telephone & Telegraph Corp., 147 F.Supp. 934 (D.C.N.J., 1957):

> "Basically the doctrine of laches is a principle of equity. The issue for the Court to decide is whether or not it is equitable to permit plaintiff's suit to proceed against defendant. * * * the court of equity must, as usual, balance against each other the equities of the adversaries."

One of the equities to resolve is whether plaintiff is chargeable with a want of due diligence in failing to institute proceedings earlier. Salem Engineering Co. v. National Supply Co., 75 F.Supp. 993, (W.D.Pa., 1948). During this ten year period Mr. Hamilton's Company was successfully manufacturing and installing the Hamilton Grinding and Finishing Machine. In plaintiff's Exhibit Z, Alfred E. Hamilton, Jr., plaintiff's son, a Vice President of Hamilton Pump Company, Inc., wrote an article for Iron & Steel Engineer which appeared in February of 1948. In the article both the slab grinder and the Hamilton Grinding & Finishing Machines are described. The evidence is important at this point with respect to Mr. Hamilton's activity because it conclusively shows that he was building machines useful in the production of stainless steel. His Hamilton Grinding & Finishing Machine was apparently successfully marketed but the machine covered by his patent was uneconomical and discarded. The point of this evidence as it concerns the defense of laches is that Mr. Hamilton was in the steel business. Further, he had read the articles in the trade journals which described defendant's accused machines and which were successful. He is therefore charged with knowledge that defendant had a successful machine which accomplished the same objects covered by his patent. It seems apparent that when Mr. Hamilton's own machine proved uneconomical and was abandoned by Sharon Steel, that he in turn abandoned any idea of enforcing his patent monopoly, if any. During this whole period of time plaintiff lived in the Pittsburgh area and was active in the business. During this period of time changes in the steel making processes were taking place, especially in stainless steel. Defendant's accused machines were sold for approximately $33,000.00 each. It appears unthinkable that during this ten year period Mr. Hamilton was unaware of the mechanics and operation of defendant's machines. If he was unaware of the claimed infringement during this period then it was because he was blind to the information which was easily available to him.

Counsel for defendant shall submit detailed Findings of Fact and Conclusions of Law and an appropriate judgment. Order in accordance with this Opinion.

---

[1]. See Seghers v. Gardella, 55 F.Supp. 914, (N.D.Ohio E.D., 1944) where ill health is not enough reason for delay.