## DURAND et al. v. BETHLEHEM STEEL CO.

### No. 7593.

Circuit Court of Appeals, Third Circuit.

June 30, 1941.

Rehearing Denied Aug. 26, 1941.

Walter J. Blenko, of Pittsburgh, Pa., and Robert T. McCracken, and Montgomery & McCracken, of Philadelphia, Pa., and Stebbins & Blenko, of Pittsburgh, Pa., (George E. Stebbins and William H. Webb, both of Pittsburgh, Pa., on the brief), for plaintiffs.

Clarence D. Kerr, of New York City, and Richards, Layton &, Finger and Charles F. Richards, all of Wilmington, Del. (Charles H. Walker and Fish, Richardson & Neave, all of New York City, on the brief), for appellee.

Before BIGGS, CLARK, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

The appellants, patentee and licensee of the three patents in suit, charged the appellee with infringement. The appellee pleaded that all of the claims in suit are invalid for anticipation and lack of invention, and that, if valid, they were not infringed. The court below found all of the claims of the patents in suit invalid

---

302–303; Trade-Mark Reporter Digest, Vols. 15–26, pp. 236, 237; 293–303.

[8] See footnote 1 above.

and not infringed, D. C., 34 F.Supp. 134, and the appeal at bar followed.

The appellant Jean Baptiste Durand, in Patent No. 1,924,028, issued on August 22, 1933, upon an application filed September 21, 1929, allegedly discloses a new composition and a new method for making foundry molds from sand, cement and water.[1] The gist of his disclosures is contained in the following language of his specifications: "The molding sand is simply mixed in the dry state with cement and water is added in such proportion that the mixture does not become pasty or plastic, but always stays subhydrated, i. e. the proportion of water is such that a part of the cement, mixed with the sand, does not set. When taken in the hand this cement-sand mixture is just coherent enough to form a highly friable ball." As an example of the quantities of materials employed in the mix, Durand's patent provides that, " * * * the proportions used for the pure silicious sand containing 97% of silica * * * and the ordinary Portland cement of the quality employed in reinforced concrete are on the average five parts of sand to one part of cement, the parts being reckoned by volume."

Again and again Durand refers in his patent to his guiding principle, subhydration. The specifications further say in respect to it: "From what has been stated above it will be understood that an essential feature of this invention is the use of only so much water as will keep the mixture always in a sub-hydrated state and not permit it to become pasty or plastic, the result being that it becomes possible to pour molten metal into the molds without the occurrence of boiling or bubbling. This calls for an upper limit of hydration considerably below the lower limit thereof prescribed according to the usual practice in making similar compositions, and below the limit commonly prescribed for the purpose of causing the hydraulic binder to set completely. As to the lower limit of hydration according to the present invention it is only necessary to see that water is used in sufficient quantity to avoid a too

friable condition of the mixture for convenient handling."

In his patent Durand claims a number of advantages for his process and composition. These may be detailed briefly. He contends that when his mixture or composition is "sufficiently hydrated though sub-hydrated" it is possible to draw out the pattern immediately and that the mold will maintain itself in position even as to vertical faces without varying in shape; that while the molds " * * * are left to bind or set for several hours", none the less they can be handled without special care in about six hours, " * * * this being the average time of setting." He states that his process eliminates the necessity of the ramming operation and " * * * enables a considerable porosity to be obtained [in the mold] which, in conjunction with the removal of most of the water by hydration by chemical combination with the [cement], renders it possible to cast without fear of boiling or bubbling occurring." Durand lists other alleged advantages; the elimination of the heating operation in order to dry the mold, the production of smoother castings, a greater strength in the mold to withstand the heat of molten metal, the avoidance of the use of foundry flasks and the use for making cores of the same sand-cement composition employed to make the mold itself, and the possibility of employing unskilled labor.

What does Durand mean by subhydration? Hydration is the chemical reaction which takes place between water and some other substance. Hydration of cement is the chemical reaction between cement and water whereby the cement is hydrated. The prefix "sub" signifies nothing more than that the term to which it is prefixed is present in only relatively small proportion or in less than the normal amount.

It has been common knowledge for many years among those who make sand-cement molds that the water in a mix does not combine fully with the cement particles of the composition. This is because the chemical reaction first takes place between the water and those portions of the ce-

---

[1] Claims 1–4, 7–9, 11 and 12 are in issue. Claims 1 and 12 are typical.

Claim 1 is as follows: "A composition of matter, consisting in an agglomeration of sand, a hydraulic binder and water in such quantity as necessary to conserve a subhydrated state."

Claim 12 is as follows: "A process for casting metal pieces, which consists in mixing sand and a hydraulic binder with only so much water that the mixture remains subhydrated, placing said composition in a mold box containing a pattern, ramming it lightly therein and casting the metal when the hydraulic binder has set and without drying the mold."

ment particles in juxtaposition to it. The chemical reaction forms a gel or agglomerate which hardens in a protective shell around those portions of the cement particles to which the moisture has not penetrated. The result is that parts of the cement particles remain unhydrated.

In his brief Durand supplies what he considered a satisfactory test of subhydration. He states that a hydrated mix is one which, if it is mulled down into a powder, care being used to avoid rupturing the hydrated shells on the cement particles, and rewetted, will not re-set, but will remain a loose powder. The word mull means to powder, to crush, to pulverize. Durand, as we have already stated, discloses in his patent a mixture in which "the proportion of water is such that a part of the cement, mixed with the sand, does not set." He argues that if his mix is mulled down without rupturing the hydrated shells on the cement particles and again wetted, it will re-set because the unexhausted portion of the cement is still available for hydration. This is true of Durand's mix and we think that it is also true of any other mix that could be made outside of a laboratory. For this reason Durand's test becomes meaningless. The only way in which any agglomerate could be mulled down without rupturing the hydrated shells of the cement particles, would be by gently breaking down the mass, leaving unactivated cement particles (as distinguished from those in which a chemical reaction has taken place) free to combine chemically with water. In other words the patent discloses nothing beyond such a physical condition in the mix (an excess of cement over water) that the chemical reaction, hydration, cannot take place between all of the cement and the water. In his brief Durand's counsel states that he, Durand, "* * * conceived of a mix containing an excess of the relatively expensive ingredient, cement—an excess which could never become active because of lack of activating water." This is practically true of almost any sand-cement mix which could be made under conditions attending commercial manufacture. Since the patent gives proportions of sand and cement (five to one, reckoned by volume) but no proportion of water, if we give the disclosures of the patent the most favorable interpretation possible, we must conclude that Durand teaches nothing more than the use of much cement and little, or a relatively small proportion of, water.

■ Assuming that the patent is not invalid for want of definiteness, can it be sustained in view of the prior art? We think there are insuperable obstacles to holding it valid.

John Smith's Patent No. 575,074, for "Molder's Core" issued in 1897. Any method which can be used for making a core can be used for making a mold. Smith described a sand-cement core to be made without heating or stoving. While he disclosed the use of "any sticky fluid, such as molasses-water" to hold the mixture together, as an alternative method he taught that "the sand and cement may be mixed together and sprinkled with water until the composition is moist enough for molding." Obviously Smith's use of water was very similar to that described by Durand. Smith sprinkled the water on the composition until it was moist (not wet) enough for molding. Smith used little water. Durand uses little water. Smith's disclosure is sufficiently close to Durand's to afford complete anticipation. Our opinion in this respect is confirmed by reference to "The Principles of Iron Founding", an article published by Richard Moldenke, copyrighted in 1917, where the author refers to the use of cement in the mix for manufacturing cores. He states, "One part of cement was used to nine parts of sharp sand, with just enough water to dampen the material and allow the cement to set." Moldenke referred to Smith as the originator of the idea of using cement as a core binder. We deem it unnecessary to refer to any further anticipations of Durand contained in the patents or publications of the prior art.

The appellee cites numerous prior public uses. At least two of these constitute valid defenses to the patent: that at the Raritan Copper Works at Perth Amboy, New Jersey, and that at the National Tube Company, McKeesport, Pennsylvania. Both were established long prior to the date of Durand's application.

■ There is evidence that Durand achieved substantial commercial success with the patent, but this fact alone cannot sustain validity.

■ The other two patents sub judice, No. 1,918,089 (claim 3) and No. 1,918,090 (claims 1, 4 and 5), admittedly are but im-

provements upon the processes and products disclosed by Patent No. 1,924,028. They are invalid for the reasons stated in respect to the principal patent.

In view of what we have stated it is unnecessary to express a conclusion as to the alleged infringement of the patents by the appellee.

The decree of the court below is affirmed.