90

## SILVRAY LIGHTING, Inc. v. VERSEN et al.

Civ. No. 10139.

United States District Court
Third D. New Jersey.
June 23, 1952.

See also, 10 F.R.D. 507.

Floyd H. Crews, New York City, for plaintiff.

Karl Huber, Newark, N. J., Harry B. Rook, Newark, N. J., of counsel, for defendants.

SMITH, District Judge.

This is an action under the patent laws for the infringement of claim 1 of Patent No. 2,303,747, issued on the application of Frank P. Kuhl but assigned to the plaintiff prior to its issuance. The action is essentially one for contributory infringement. The answer filed by the defendants pleads the usual defenses, to wit, invalidity of the claim and noninfringement.

### Invention

The claim in issue covers an article of manufacture, termed in the patent an "indirect lighting fixture." The claim defines the invention as follows: "An indirect lighting fixture utilizing ceiling reflection, said fixture comprising an *incandescent bulb of the silvered bowl type* having a silvered reflecting area thereon extending from its tip to a cut-off line approximately at the level of the filament, whereby the light beam emitted by said bulb has a spread of

approximately 180 (degrees), a mounting for said bulb whereby it is supported with its base uppermost and its silvered bowl lowermost in spaced relation to a ceiling, said mounting being of a character to offer no *appreciable obstruction* to the passage of light from the bulb to the ceiling, and *shielding means* supported on the fixture at the level of and in spaced relation to the bulb *so as not to obstruct the passage of air currents upwardly over the bulb* said *shielding means* including a *plurality of cylindrically arched surface portions coaxial with the vertical axis of the bulb,* and each of said arched surface portions consisting only of *vertical surface elements* that offer no appreciable obstruction to the passage of light or air in a vertical direction, and will not collect dust, and will serve to prevent glare from the bulb reaching the eye of an observer positioned to the side of and below the level of the fixture, and said arched surface portions being spaced from each other and from the bulb in a *radial direction,* with their upper edges at *progressively higher levels as the radii thereof increase* and so that the upper portion of each *receives light directly from the bulb, and the said arched surface portions being at a level so that their upper edge portions intercept only a relatively small portion of the marginal light rays of the light beam* emitted by the bulb, whereby the spread of said light beam will not be materially reduced, the upper edge of each arched surface portion being at a higher level than the lower edge of the next surrounding arched portion, and there being no obstruction to the passage of light from the bulb to the ceiling other than that due to the mounting, and substantially no obstruction by the fixture to the vertical passage of light from the ceiling downward, whereby when the fixture is hung below a ceiling, the wide spread of the light beam emitted by the bulb will result in the illumination of a substantial area of the ceiling, and substantially all the light reflected from the ceiling will be utilized in illumination of the working plane." (Emphasis by the court.) The structure defined in this claim is illustrated in Figure 1 of the specifications, a copy of which is hereto annexed.

### *Fig. 1.*

INVENTOR.

Frank P. Kuhl.

BY *Glanet & [signature]*

ATTORNEYS

The invention comprises two elements: first, an incandescent lamp silvered in the manner described, a lamp which had been in common use prior to the advent of the patent in suit; and second, an opaque shield consisting of a plurality of annular rings vertically arranged at progressively higher levels as the radii thereof increase and so disposed around the lamp as to "intercept only a relatively small portion of the marginal light rays" and to permit the passage of light and air upward and downward. These elements were admittedly old in the art and had been in common use in similar assemblages for several years prior to August 1, 1940, when Kuhl filed his application.

### Prior Art

The Tillson Patent, No. 1,373,845, issued April 5, 1921, covers a lighting fixture which is defined in claim 2, which is typical, as follows: "A lighting device having a *light source*, a reflector above said source, and a *plurality of annular translucent elements arranged at different levels* below said reflector, the upper translucent element being of smaller diameter than the reflector and the second translucent element being of smaller diameter than the first translucent element, the upper edge of the upper translucent element being *high enough to intercept the rays which would escape the edge of the reflector* and the upper edge of the lower translucent element being *high enough to intercept the rays which would escape the lower edge of the upper translucent element*, and an *opaque disk directly beneath the light source* and having a diameter great enough to intercept the rays which would escape the lower edge of the lower translucent element, the upper translucent element having a concave inner surface facing inward and downward, and the second translucent element having a concave inner surface facing inward and upward and the radii vectores of both the upper and second translucent elements lying entirely within the respective elements."

This invention was an improvement on the earlier fixtures in which the lamp was disposed within a translucent shield of the bowl type. The invention of the cited reference may be distinguished from the invention of the claim in suit, but it cannot be doubted that the reference discloses the utilization of similar structural elements, to wit, a lamp shielded by an opaque reflector "beneath the light source," and a plurality of annular translucent elements arranged vertically at progressively higher levels as the radii thereof increase and so disposed around the lamp as to shield it from view. A study of the history of the art reveals that the opaque reflector had been in common use in the art prior to the introduction of the silvered lamp by which it was replaced.

The Strauss Patent, No. 1,472,502, issued October 30, 1923, covers an improvement in *"Lamp Shades."* The invention is defined in claim 2 as follows: "In a lamp shade, a sectional diffuser adapted to be mounted, in combination with and beneath a reflector, and beneath and around a source of light, and comprising a *central and series of successively larger members of translucent material arranged concentrically, to intercept and diffuse all rays impinging thereon directly from said source, and spaced from one another to afford relatively unimpeded passages for reflected rays, the walls of said members being vertical* so that said passages may be as wide as possible, * * *, said spaces being otherwise left open for such passage and for ventilation * * *." This claim, interpreted in the light of the specifications, likewise discloses a plurality of concentric elements arranged at different levels and so disposed around the lamp as to permit the passage of light and air upward and downward; these elements are so spaced from each other and from the light source "as to intercept and diffuse all rays falling thereon from said source."

The objects of this invention are apparent from the specifications, wherein it is stated: "It will be observed * * *, that all rays emanating downward or *laterally* from the source of the light will be intercepted by said members and broken up or diffused, while the rays emanating upward therefrom will be reflected, and most of them will pass unimpeded downward through the openings of spaces, * * * thus affording a maximum of light down-

ward, *while at the same time preventing all glare to the eyes upon looking at or in the direction of the lamp, and also affording the ventilation necessary for the maximum life of the lamp* or bulb." It is interesting to note that the specifications of the Kuhl Patent state that the "particular objects of (his) invention," in addition to others, are to prevent glare and provide ventilation.

The Gerard Patent, No. 1,801,858, issued April 21, 1931, covers a "semi-indirect lighting fixture" which is therein described (claim 12) as follows: "A light fixture comprising a support, a *light source* carried thereby, a plurality of brackets depending from said support about said light source, an *opaque reflector disposed below said light source* and secured to the lower ends of said brackets, an *annular opaque reflector surrounding* said *light source* above said first-mentioned reflector * *, both of said reflectors being arranged to reflect upward light cast downwards from said light source and the bottom of said annular reflector being arranged to reflect downwards light directed thereagainst by the lowermost reflector, *means for illuminating the underside of said lowermost reflector,* and a shield surrounding the lower end of said support and the upper portion of said light source."

The invention therein defined comprises the following: a frosted incandescent lamp; an opaque reflector disposed below the lamp; inner and outer annular elements, identified in the patent as opaque reflectors, arranged vertically at different levels and so disposed around the lamp and spaced therefrom and from each other as to intercept and diffuse the light; and, a concave reflector of greater diameter than the annular elements and disposed above them. The outer element is provided with an "upwardly convex annular bottom" which extends inwardly and rests above the upper edge of the inner element. The patentee utilizes the annular elements in combination with reflectors to shield the lamp, prevent glare, and diffuse the light. It should be further noted that the outer element is so placed that its upper edge

is approximately at the level of the lamp filament.

The patentee states in his specifications: "It is therefore readily apparent that I have provided a lighting fixture which is of attractive design and which will serve to illuminate a room or the like with a pleasant, softened light, in view of the fact that none of the rays of light from the bulb * * * can pass directly downwards to illuminate the room. Rather they must traverse tortuous paths, being first reflected upwards by the upper face of one reflector and then reflected downwards by the lower face of another reflector. Hence the rays of light will be softened or diffused, producing the well-known indirect lighting effect. Moreover, substantially the entire exterior surface of the fixture is illuminated, producing an article of unusual and attractive appearance." It is apparent from this statement that the annular elements are utilized in combination with the reflectors to diffuse the light and to impart uniform luminosity to "the entire exterior surface of the fixture."

When we first studied this reference we entertained some doubt as to the relevancy of its teachings, but upon more careful analysis we are convinced that its disclosures would be most instructive to the person possessed of the expected knowledge and skill of the art.

The necessary limits of this opinion will not permit a comprehensive discussion of other cited references which, like those heretofore discussed, teach the utilization of a plurality of vertical elements, circular and polygonal in shape, arranged at different levels and so disposed around the light source as to intercept and diffuse the light emanating therefrom. (See Ferree Patent, No. 1,906,559, granted May 2, 1933; Symmes Patent, No. 1,790,179, granted Jan. 27, 1931; Sibbert Patent, No. 2,134,491, granted October 25, 1938; Folsom, The Control of Light with Louvers, published July, 1937.) They disclose many variants of the combination; these variants differ in general appearance and design, but in each a plurality of annular elements are utilized to perform the same function.

These references also disclose the particular utility of both translucent elements made of frosted glass and opaque elements made of metal.

The claim to patentable invention necessarily rests, as the plaintiff concedes, on the specific arrangement of the elements as defined in the claim in suit. This arrangement is described therein as follows: "said arched surface portions" (the annular elements disposed around the lamp) "being spaced from each other and from the bulb in a radial direction, with their upper edges at progressively higher levels as the radii thereof increase and so that the upper portion of each receives light directly from the bulb, and the *said arched surface portions being at a level so that their upper edge portions intercept only a relatively small portion of the marginal light rays of the light beam emitted by the bulb, * * *,* the upper edge of each arched surface portion being at a higher level than the lower edge of the next surrounding arched portion."

The plaintiff, supported by the testimony of the patentee, now urges that in the arrangement described in the claim the upper edges of the annular elements follow the light distribution curve of the silvered lamp. It will be noted, however, that the claim is not limited to this specific arrangement although the specifications of the patent seem to recommend it. We accept this construction only for the purpose of discussion and proceed to an examination of the prior art in the light of it.

The Ferree Patent, No. 1,596,725, issued August 17, 1926, covers an article of manufacture therein identified as a "semi-indirect lighting fixture." The invention is defined in claim 3, which is typical, as follows: "A lighting fixture comprising a bowl-shaped member of translucent material, which member is provided with a central opening, and the *inner surface of which bowl-shaped member curves gradually outwardly and upwardly from a point adjacent the edge of said opening,* a light source, and a bulb surrounding the same, the *outer surface of the lower end portion of which is provided with a metal coating, the upper edge of which is located*

*in a plane in substantially flush relation to the adjacent inner surface of the said bowl-shaped member."* The specifications recommend that the "inner surface of the bowl should have a *gradual curve* from the center outwardly and upwardly, * * *, so as to cause it to receive *equal amounts of light from the upper portion of the light source, * * *,* the intention being to provide a softly luminous bowl of low and even brightness with a minimum loss of light."

The invention of Ferree comprises the following: an upwardly concave shield provided with a central opening, and an incandescent lamp, silvered in the manner described by Kuhl, disposed within the said opening so that the upper edge of the silvered segment "is located in a plane in substantially flush relation to the adjacent inner surface" of the shield. The inner surface of the said shield, disposed around the light source in the manner required, follows substantially the light distribution curve of a silvered lamp and intercepts only a relatively small portion of the direct light. The claims of Ferree appear to be limited to a semi-indirect lighting fixture, but his specifications disclose that such a fixture may be converted into one of the indirect type by the substitution of a shield of sufficient density; a metal reflector would obviously answer this requirement. It should be noted that in this invention the ceiling surface is utilized as a reflector.

The Howell Patent, No. 2,102,462, issued December 14, 1937, on an application filed on July 25, 1932, covers "a lighting fixture adapted for *fully indirect lighting* for producing a strong substantially uniform illumination upon a diffusing surface, e. g., *the ceiling of a room,* whereby a shadowless soft illumination will be had at the working level." The essential elements of the invention are described in claim 1, which is typical, as follows: "A lighting fixture comprising a tubular supporting shaft adapted to carry electrical conductors, a supporting block secured to the bottom of said shaft * * *, a lamp socket secured to the bottom of said supporting block, a lamp mounted in said lamp socket

*having the portion of the glass thereof below the level of the filament silvered to provide a spherical reflector,* *\* \* \**, a light-permeable bowl *\* \* \** having a central opening *\* \* \** adapted to permit the lamp bulb *\* \* \** to project therethrough, whereby the silvered portion of the bulb forms a visible part of the fixture when viewed from below, *said bowl being shaped to follow approximately the photometric curve of the lamp,* whereby the bowl will be uniformly illuminated, but will intercept only a very small proportion of the light from the lamp *\* \* \*.*"

Claim 7 of this patent defines a simple variant of the invention as follows: "An *indirect lighting fixture* adapted to illuminate a diffusing surface in a room, comprising a lamp and electrical connections therefor, *a concave substantially opaque reflector* associated with said lamp adapted to throw *outward and upward* the light radiated downward by said lamp, a *shield* surrounding said lamp near but spaced from the rim of said reflector whereby to receive on its under side a *small amount of outwardly directed light* whereby it will glow with a reflected light of low intensity, and a *supplemental shield* closely surrounding the reflector and covering the space between it and the first-named shield whereby to prevent glare therefrom."

The variant defined in claim 1 comprises the following essential members: an upwardly concave shield shaped "to follow approximately" the light distribution curve of the lamp and provided with a central opening, and an incandescent lamp, silvered in the manner described by Kuhl, disposed within the said opening so that the upper edge of the silvered segment is on a plane with the adjacent inner surface of the shield. It is clear that in the variant defined in claim 7 a plurality of annular opaque shields, arranged at different levels as the radii thereof increase, is substituted for the shield defined in claim 1. The patentee states that in this embodiment the exterior surface of the fixture is illuminated by "reflected light of low intensity." It should be noted that in either variant the annular elements are so constructed and arranged as to prevent the passage of direct light downward; the invention has for its principal object the production of uniform and efficient illumination.

Folsom, the Control of Light With Louvers, published in July 1937, is a comprehensive treatise on the subject. The real significance of this article lies in its disclosure of: first, the utility of vertical elements disposed around the light source to control light; second, the adaptability of these elements to the construction of lighting equipment and fixtures; and third, the many possible arrangements of these elements to achieve a predetermined result. The article is evidence of the many variants which would readily occur, as they did to Folsom, to the person possessed of the expected knowledge and skill of an art, indirect lighting, which at the time was highly developed.

The article contains more than fifty illustrations of lighting units in which opaque elements vertically arranged are utilized to control and diffuse light. An apposite illustration is shown in Fig. 8–D on page 751. The arrangement is described by the writer as follows: "At times a ceiling condition cannot be adapted to indirect lighting. A suitable diffused lighting effect may be accomplished by using louvered direct fixtures of the type indicated in Fig. 8–D. The one shown consists of a large dome of diffused illumination containing a lamp. Louvers are introduced principally to conceal the lamp bulb itself and have been made of parchment. A *small reflector* below the lamp has a surface shaped to project a small amount of light on to the ceiling."

The fixture comprises the following: an incandescent lamp with an opaque reflector disposed around the lower half of the bowl so as to shield the filament; a plurality of flared elements vertically arranged at progressively higher levels as the radii thereof increase and so disposed around the lamp as to present no appreciable obstruction to the passage of light; and third, a reflector of the dome type disposed above the unit. The vertical elements are so spaced as to permit the passage of light and air upward and downward. It seems obvious that the removal

of the dome type reflector would permit the utilization of the ceiling surface, in lieu thereof, as a reflecting medium. The only objection to the adoption of this simple expedient is suggested by the writer, who states that at "times a ceiling condition cannot be adapted to indirect lighting."

There is here cited as prior art a fixture, hereinafter identified as the *Pendant,* which was installed in the Modern Reference Library of the Christian Science Publishing Society early in 1936. A number of these fixtures were in public use in the library until 1947, when they were replaced by fixtures of the fluorescent type. A diagramatic sketch of the *Pendant* and a dimensional cross-section of its elements, in comparative relationship with the elements of the Kuhl invention, are shown in Appendix B, hereto annexed.

vertically at progressively higher levels as the radii thereof increase, and so disposed around the lamp as to shield the upper half from view while offering no appreciable obstruction to the passage of light, either direct or reflected, and air; and, a concave reflector of translucent glass, approximately twenty-six inches in diameter, disposed above the unit described. The lamp is so disposed within the annular elements that only the lower portion of the silvered segment protrudes below the lowest ring, forming a visible part of the fixture. The removal of the reflector, an obvious expedient, would permit the utilization of the ceiling surface as a reflecting medium.

The annular elements of the *Pendant* are made of aluminum and are so arranged that only the "upper portion of each," approx-

The *Pendant* comprises the following: an incandescent lamp silvered in the manner described by Ferree, Howell and Kuhl, a lamp which was then in common use; a plurality of annular elements arranged

imately one-third, "receives light directly from" the lamp; the lower edge of each element is shielded from direct light by the upper edge of the element disposed within it. The upper edges of the elements are

arranged so as to encroach but slightly upon the light distribution curve of the lamp and to intercept only a portion of the light; whether or not they are arranged so as to "intercept only a relatively small portion of the marginal light rays," a distinguishing feature claimed by Kuhl, is difficult of determination because of the absence of an adequate definition of the critical term "marginal light rays."

It seems obvious, however, that if the annular elements of the *Pendant* were rearranged so as to "follow" the light distribution curve, an expedient which would readily occur to the artisan, particularly one having a knowledge of the teachings of Ferree and Howell, this fixture would possess all the advantages claimed by Kuhl for his invention. It is our opinion that even without this modification the structures of the *Pendant* and the Kuhl invention are similar, if not identical. The upper edges of the annular elements in each structure encroach but slightly upon the light distribution curve of the lamp; the only difference is in the degree of encroachment, and this difference is not appreciable, as was demonstrated in open court. The suggested modification of the annular elements of the *Pendant* would only increase the efficiency of the fixture but the elements would perform the same function. It should be noted that the removal of the dome reflector without any other modification would increase the efficiency of this fixture by approximately twenty percent.

There is also cited as prior art a fixture manufactured and distributed commercially by the defendant prior to 1940. This fixture, the *Silvray, 207 PL*, comprises the following: an incandescent lamp silvered in the usual manner; a plurality of annular elements arranged vertically and disposed immediately around the lamp; and an upwardly concave shield, provided with a central opening, disposed around the annular elements so that its inner surface encroaches slightly upon the light distribution curve of the lamp. The upper edges of the annular elements are on a plane with the adjacent inner rim of the shield. The annular elements are here utilized in combination with a plastic shield; this combination is obviously nothing more than a simple variant of the reflector described by Howell and performs the same function. The efficiency of the *Silvray* is comparable to the efficiency of a fixture manufactured in accordance with the teachings of the patent in suit.

### Validity

The question presented for determination is whether or not the patentee's contribution to the art, which was highly developed prior to the advent of his patent, is such an advance over the prior art as will support the claim to patentable invention. The purported invention of the disputed patent must be appraised in the light of the prior art, considered in its entirety. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 130, 95 L.Ed. 162; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Saranac Automatic Mach. Co. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634, and other cases hereinafter cited. Where, as in this case, the claim in issue covers nothing more than an assemblage of old elements, it must be scrutinized with a "care proportioned to the *difficulty* and *improbability* of finding invention" in such an assemblage. Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra.

The inventions of Ferree and Howell were directed to the solution of a problem known in the art. They recognized that disadvantages common in many lighting fixtures—the glare emanating from the filament of the lamp and the high concentration of bright light—could be overcome if a silvered lamp was disposed within the central opening of a translucent or opaque shield in the manner heretofore described. They also recognized that these disadvantages could be overcome without any impairment of the efficiency of the lamp if the shield, disposed around the lamp, was so constructed that its *inner surface* either *encroached* but *slightly upon* or *followed* approximately the *light distribution curve* of the lamp.

The efforts of Kuhl were directed primarily to the solution of the same problem, and the teachings of Ferree and Howell

were known to him when he entered the field. The specifications of the Kuhl patent state: "The Ferree Patent * * * and the Howell Patent * * * are examples of arrangements for eliminating this glare in such illumination, comprising a translucent bowl supported in close adjacency to said bulb cut-off line with the bowl extending generally outwardly and laterally into the path of the line of vision to the bulb. The bowl in both of these patents *is contoured and dimensioned so as to encroach slightly upon the light distribution curve* so as to avail itself of some of the lumens to illuminate the bowl which is made translucent to effect this purpose." It should be noted, however, that the Howell patent discloses variants in which opaque, translucent, opalescent, or transparent shields may be utilized.

There can be no doubt that Kuhl, a professional engineer, was fully cognizant that a fixture constructed in accordance with the teachings of Ferree and Howell possessed many advantages and was an improvement over the prior art; in fact his invention follows their teachings. He perceived that the only disadvantages of the Ferree and Howell fixtures were inherent in the upwardly concave reflector which, according to his specifications, collected dust and interfered with ventilation. These disadvantages were overcome by the adoption of a rather obvious expedient disclosed by the prior art, to wit, a louver type shield consisting of a plurality of annular elements vertically arranged at progressively higher levels as the radii thereof increase and so disposed around the lamp as to offer no appreciable obstruction to the passage of light and air.

The claim to patentable invention here rests solely on the distinctive arrangement of old elements, an arrangement in which the vertical shields are so disposed around the silvered lamp that their upper edges follow the light distribution curve and intercept only a relatively small portion of the light. This arrangement may be an improvement on the louver type shield disclosed by the prior art, but, appraised in the light of the teachings of Ferree, Howell and Folsom, it is not a patentable improvement. The conception of this arrangement required nothing more than a knowledge of the art and the expected skill of the artisan.

There is evidence that the *Pendant*, hereinabove described, was designed by one Blanche L. Davenport, a librarian who admittedly had no knowledge of the art, and was constructed by an electrician. She admits that she and the electrician experimented with a plurality of annular elements vertically arranged and disposed around a silvered lamp after she had seen other fixtures in which such elements were utilized to control the light and prevent glare. These experiments proved successful, and thereafter the louver type shield which she designed was substituted for a translucent reflector of the bowl type in eighteen fixtures then in use in the library. The *Pendant*, like the invention of Kuhl, was designed to overcome the high concentration of light on the working plane.

The invention of the claim in issue comprises nothing more than an aggregation of old elements in a structure in which these elements perform no new or different function. It is well established that such aggregations are patentable "only when the whole in some way exceeds the sum of its parts". Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 71 S. Ct. 130; Cuno Engineering Corp. v. Automatic Devices Corp.; Saranac Mach. Co. v. Wirebounds Co., all supra; Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334; Powers-Kennedy Contracting Co. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971; Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110; F. W. Wakefield Brass Co. v. Mitchell Mfg. Co., 7 Cir., 191 F.2d 577; Park-in-theatres v. Perkins, 9 Cir., 190 F.2d 137; Detroit Gasket & Mfg. Co. v. Victor Mfg. & Gasket Co., 7 Cir., 114 F. 2d 868; Ainsworth v. Gill Glass & Fixture Co., 3 Cir., 106 F.2d 491. The invention of the claim in issue does not meet this rigid test of patentability, and the claim is therefore invalid because of the lack of patentable invention over the prior art.

There is undisputed evidence that the fixture was favorably received by the trade and realized considerable commercial success. The claim to patentable invention seems to be rested rather heavily on this evidence, which is voluminous. However, this evidence will not support a conclusion that the commercial success was exclusively ascribable, if at all, to any widespread demand for the invention. The commercial fixture was efficient, modern in design, and attractive in appearance; it had what is commonly termed "sales appeal." The commercial success upon which the plaintiff relies was undoubtedly influenced, if not entirely produced, by the efforts of efficient sales organizations of several large distributors of electrical equipment. When these factors are considered, the weight of this evidence is so diminished that the evidence ceases to be persuasive.

The plaintiff relies primarily on the case of Goodyear Tire Rubber Co. v. Ray-O-Vac. Co., 321 U. S. 275, 64 S.Ct. 593, 88 L. Ed. 721. That case is easily distinguishable from the present one. The evidence in that case was apparently sufficient to support the court's determination that: the invention was directed to the solution of a problem which had baffled the industry for many years and to which no solution had been found despite the concerted efforts of those skilled in the art; the invention, although simple, was based upon principles not theretofore disclosed or taught by the prior art; and, the commercial success was ascribable to the merits of the invention. The evidence in this case will not support a similiar determination and adds little weight to the claim of patentable invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S. Ct. 449, 79 L. Ed. 997. We have examined the other cases cited in the plaintiff's brief and we find that in the majority of those cases the courts held the patents invalid notwithstanding the evidence of commercial success.

■ It is well established that commercial success, even where the evidence is sufficient to sustain it, is an unreliable test of patentable invention and should not be resorted to except where the issue is in doubt. Evidence of commercial success, although persuasive in doubtful cases, will not overcome the obvious lack of patentable invention. Jungersen v. Ostby & Barton Co., 335 U.S. 560, 567, 69 S.Ct. 269, 93 L.Ed. 235; Paramount Corp. v. American Tri-Ergon Corp., supra, 294 U.S. 474, 55 S.Ct. 449; DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 685, 51 S.Ct. 563, 75 L.Ed. 1339; Pfanstiehl Chemical Co. v. American Platinum Works, 3 Cir., 135 F.2d 171, 174; Durand v. Bethlehem Steel Co., 3 Cir., 122 F.2d 321, 323; Atlantic Refining Co. v. James B. Berry Sons Co., 3 Cir., 106 F.2d 644, 650. The lack of patentable invention is beyond doubt in the instant case, at least in the mind of this court, and the commercial success doctrine therefore has no application.

■ The claim in issue is invalid also because of its failure to meet the requirements of the statute, 35 U.S.C.A. § 33. The statute requires a patentee to define his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, * * * to make, construct, compound, and use the same;" and, to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The statute requires that the limits of the patent monopoly be defined with certainty.

The reasons for the latter requirement are succinctly stated in the case of General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 369, 58 S.Ct. 899, 902, 82 L.Ed. 1402, as follows: "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' "

The distinctive arrangement of annular elements, the feature upon which the claim

100

to patentability here rests, is described in indeterminate adjectives which fail to define adequately the limits of the patent grant. The evidence in this case clearly demonstrates that the claim in issue, if accorded the broad interpretation urged by the plaintiff, will embrace not only the *Draco* fixture, which is here alleged to infringe, but also the *Pendant* hereinabove described. The claim creates a zone of uncertainty which would preclude the utilization of the prior art by others and thus stifle its normal development.

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine. Congress has provided that a patent may be awarded only for a new and useful manufacture 'not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof.' R.S. § 4886, 35 U.S.C. § 31, 35 U.S.C.A. § 31. While we do not find it necessary to consider questions of novelty and invention, in the view we take of the claims in suit, a mere reading of prior art patents shows how, if they are read with the liberality and inclusiveness claimed for those in suit, they describe products, if not identical, at least of confusing similarity. Whether the vagueness of the claim has its source in the language employed or in the somewhat indeterminate character of the advance claimed to have been made in the art is not material. An invention must be capable of accurate definition, and it must be accurately defined, to be patentable." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 237, 63 S.Ct. 165, 170, 87 L. Ed. 232.

Conclusion

The claim in issue is invalid for the reasons herein stated.

NOTE: The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.